AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Facebook Account Name: Alma Martinez;<br>User ID: 100013809722144 | )<br>)   Case No.   **19MJ0506**<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated herein)

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Secs. 952, 960, and 963; Title 18 U.S.C. Sec. 2 | Importation of Methamphetamine; Conspiracy to Import Methamphetamine; Aiding and Abetting |

The application is based on these facts:

See attached Affidavit (incorporated herein)

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Greg Pettigrew, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __2/6/19__

_____
*Judge's signature*

City and state: San Diego, California            Hon. Jill L. Burkhardt, United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH:<br><br>ACCOUNT NAME: ALMA MARTINEZ, USER ID: 100013809722144<br><br>THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | **AFFIDAVIT OF SPECIAL AGENT GREG PETTIGREW IN SUPPORT OF A SEARCH WARRANT** |

I, Special Agent Greg Pettigrew, having been duly sworn, declare and state as follows:

## I.

## **INTRODUCTION**

1. I make this affidavit in support of an application for information associated with a Facebook user name and identification number that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the Facebook account name "Alma Martinez" and/or user ID: 100013809722144 (the "**Target Account**").

2. The affidavit seeks items as described in Attachment B (incorporated herein) which I believe will constitute evidence and instrumentalities of violations of

federal criminal law, namely 21 U.S.C. §§ 952 and 960 (Importation of a Controlled Substance) and 18 U.S.C. § 2 (Aiding and Abetting) from September 21, 2018, to December 21, 2018.

3. The following is based upon my experience and training, investigation, and consultation with other law enforcement agents and officers experienced in narcotics violations, including the Target Offenses. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because I make this affidavit for the limited purpose of obtaining a search warrant for the **Target Account**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause. Dates and times are approximate, and refer to Pacific Standard Time (PST) unless otherwise specified.

## II.
## JURISDICTION

4. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a "district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, the criminal offenses under investigation occurred within the Southern District of California.

5. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## III.
## TRAINING AND EXPERIENCE

6. I am a Special Agent for the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"). I have been employed as a special agent since July 2017. I am a graduate of a 27-week

criminal investigator training program at the Federal Law Enforcement Training Center in Glynco, Georgia. Prior to becoming a Special Agent with HSI, I was a Border Patrol Agent for 11 years. In addition to performing the traditional Border Patrol mission, I was a member of the Joint Targeting Team within the Sector Intelligence Unit, which conducted targeted investigations of Transnational Criminal Organizations involved in the illegal movement of people across the United States/Mexico International Boundary.

7. Through the course of my training, experience, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for drug smugglers to work in concert with other individuals and to do so by utilizing social networking and messaging applications like Facebook through digital devices like tablets, cellular telephones, and computers, to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distribution amount quantities of hard drugs, such as cocaine, heroin, and methamphetamine. Typically, load drivers smuggling controlled substances across the border are in digital or telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substance. Drug smugglers and their organizations use cellular and digital devices, in part, because these individuals believe law enforcement cannot track the originating and destination communications.

8. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in drug smuggling investigations, I am also aware that:

   a. Drug smugglers will use social networking and messaging services on different electronic devices because it allows access to send instant messages and communicate with other individuals in addition to the standard use of cellular phones to make telephone calls, text, web, and voice messages;

  b. Drug smugglers will use social networking and messaging services because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

  c. Drug smugglers and their accomplices will use social networking and messaging services features because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

  d. Drug smugglers will use social networking and messaging services to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

  e. Drug smugglers will use social networking and messaging services to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings; and

  f. The use of social networking and messaging services by smugglers tends to generate evidence that is stored on the social media account, including, but not limited to chats, instant messages, photographs, contact lists, IP addresses, connected social network accounts, and location data.

## IV.
## BACKGROUND INFORMATION ON FACEBOOK

9. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

10. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses,

Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

11. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

12. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

13. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic

locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

14.   Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

15.   Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

16.   If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

17.   Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

18. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

19. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

20. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

21. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

22. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

23. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints

from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

24. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to

the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## V.
## FACTS IN SUPPORT OF PROBABLE CAUSE

### A. DEFENDANTS' ARREST

25. On December 21, 2018, at approximately 1:31 p.m., Defendants Alma Martinez-Estrada ("Martinez") and Alejandra Navarro-Martinez ("Navarro") applied for entry to the United States via vehicle lane 20 at the San Ysidro Port of Entry in San Diego, California. Martinez was the driver and registered owner of a 1996 Ford Taurus station wagon bearing California plates 3PBW942. Navarro was a passenger in the Ford Taurus.

26. Customs and Border Protection Officer ("CBPO") Rodriguez was conducting pre-primary roving operations during this time. As CBPO Rodriguez was inspecting another vehicle in the pre-primary area, she noticed Martinez looking in her direction. CBPO Rodriguez noticed Martinez was biting her nails and shaking her head and legs in a nervous manner. CBPO Rodriguez approached Martinez and asked about her destination within the United States. Martinez stated she was going to the UPS Store in San Ysidro. Martinez said she did not have anything to declare.

27. CBPO Rodriguez asked Martinez to place the vehicle in park so she could inspect the vehicle. As CBPO Rodriguez began inspecting the vehicle, she noticed

Martinez had begun crying. CBPO Rodriguez also heard Navarro say to Martinez, "Mom, stop crying."

      28.    CBPO Rodriguez walked to the rear of the vehicle and opened the rear hatch. CBPO Rodriguez observed a box containing what appeared to be three (3) XBOX gaming consoles. CBPO Rodriguez picked up the consoles and noticed that they felt heavy. CBPO Rodriguez asked CBPO Schiano to utilize his density reader on the consoles. The density reader gave an abnormally high reading. CBPO Schiano requested a Canine Enforcement Officer to inspect the vehicle.

      29.    CBPO Nee responded with her Human-Narcotics Detection Dog ("HNDD"). CBPO Nee's HNDD alerted to a trained odor at the Taurus's rear cargo area. CBPO Nee informed CBPO Rodriguez of the alert by her HNDD.

      30.    CBPO Beaty conducted a physical inspection of the Ford Taurus. CBPO Beaty noticed three (3) XBOX gaming consoles in the rear of the trunk, wrapped in bubble wrap. CBPO Beaty attempted to open one console by unscrewing the bottom and noticed the corners of the console had been tampered with. Upon opening the console, CBPO Beaty saw a large package wrapped in tape. CBPO Beaty inspected the other two consoles in the same manner and found two more packages. The contents of the packages field tested positive for the presence of methamphetamine and weighed a total of 6.94 kilograms (15.30 pounds).

**B.    MARTINEZ'S POST-*MIRANDA* STATEMENT**

      31.    After being advised of her *Miranda* rights, Martinez elected to waive them and voluntarily answered questions without an attorney present.

      32.    Martinez claimed that on December 18, 2018, she contacted Omar Magallon via Facebook regarding an advertisement to transport products for $100 per day. On December 19, 2018, Martinez drove from Pomona, California to Tijuana, Mexico, and met with an individual named Roberto. Martinez stated she met with Roberto again on December 20, 2018 from approximately 9:00 a.m. to 6:00 p.m.

33. Martinez said she was given the three (3) XBOX gaming consoles which she transported across the border into the United States on December 20, 2018 and then brought the consoles back over the border into Mexico later that day. Martinez claimed the purpose of this trip was to find out if she had to pay any fees for bringing the consoles across the border into Mexico. She claimed she paid 193 Mexican pesos to bring the consoles back into Mexico. Martinez also claimed Roberto told her to bring the XBOX consoles back, because they were not ready yet. On December 21, 2018, Martinez picked up the same XBOX consoles at Plaza Internacional in Tijuana and drove to the San Ysidro Port of Entry.

34. Martinez claimed she and Navarro stayed at her mother's home in the Florido neighborhood of Tijuana while they were in Mexico.

### C. NAVARRO'S POST-*MIRANDA* STATEMENT

35. After being advised of her *Miranda* rights, Navarro elected to waive them and voluntarily answered questions without an attorney present.

36. Navarro said her mother, Martinez, answered an advertisement for a company that sells repaired XBOX consoles and hoverboards after Martinez was suspended from her job.

37. Navarro said they left Pomona around 1:00 a.m. on December 18, 2018, and drove to Tijuana. She said they met with three individuals at Plaza International: (1) Alfredo, a supervisor; (2) Steven, a driver; and (3) a "white guy" whose name she could not remember.

38. Navarro said they told Martinez she would be doing bookkeeping work for the company, and tracking their XBOX consoles. Navarro said they were told the company's office was robbed and only five XBOX consoles were remaining. Navarro also said the men told them the company did not have an office, which is why all their meetings took place in a coffee shop.

39. During her interview, Navarro asked the agents "How screwed am I?" She also said she knew something was wrong because nobody buys old XBOX consoles. She also commented that the company they were dealing with had no name or address.

40. Navarro said she and Martinez slept at her aunt's home in the Florido neighborhood of Tijuana while they were in Mexico. Navarro said they only stay at her aunt's home because her grandmother's house had bedbugs.

**D. MARTINEZ'S FACEBOOK ACCOUNT**

41. Upon reviewing the contents of Martinez's cellular phone at the time of her arrest, one of Martinez's Facebook "friends," L.G., was identified. After locating L.G.'s Facebook page, we identified he was connected to an individual named "Alma Martinez." The Facebook page for Alma Martinez contained photographs that appeared to be of Martinez. This Facebook page is associated with the **Target Account**.

## VI.
## PRIOR ATTEMPTS TO OBTAIN DATA

42. The United States is concurrently seeking a search warrant for Martinez's cellular phone. If Martinez utilized the Facebook Messenger application to send or receive messages from her cellular phone, it is possible those messages could be obtained from the download of her cellular phone.

## VII.
## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

43. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## VIII.

## **CONCLUSION**

44. Based on the forgoing, I request that the Court issue the proposed search warrant. There is probable cause to believe to believe—based on Martinez's statements—that Martinez used her Facebook account to respond to Omar Magallon's advertisement and to communicate with him to coordinate a meeting in Mexico where she received the drug-laden XBOXes.

45. Because the warrant will be served on Facebook who will then compile the requested records and information at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Greg Pettigrew
Homeland Security Investigations

Subscribed and sworn to before me this ___6th___ day of February, 2019.

_____
HON. JILL L. BURKHARDT
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following Facebook user IDs and/or account names

Account Name: Alma Martinez
User ID: 100013809722144
(the "**Target Account**")

that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California. Facebook, Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at 1601 Willow Road, Menlo Park, CA 94025.

## ATTACHMENT B

### Particular Things to be Seized

**I.   Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a) All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities from September 21, 2018 to December 21, 2018;

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them September 21, 2018 to December 21, 2018, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d) All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f) All other records and contents of communications and messages made or received by the user September 21, 2018 to December 21, 2018, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g) All "check ins" and other location information;

(h) All IP logs, including all records of the IP addresses that logged into the account;

(i) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j) All information about the Facebook pages that the account is or was a "fan" of;

(k) All past and present lists of friends created by the account;

(l) All records of Facebook searches performed by the account September 21, 2018 to December 21, 2018;

(m) All information about the user's access and use of Facebook Marketplace;

(n) The types of service utilized by the user;

(o) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)   All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within fourteen days of service of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. §§ 952 and 960 and 18 U.S.C § 2 involving Alma Martinez-Estrada from September 21, 2018 to December 21, 2018, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Communications between Alma Martinez-Estrada, Omar Magallon, and other co-conspirators not known to the United States, regarding importing federally controlled substances into the United States, obtaining the federally controlled substances from other individuals, arranging for payments related to the importation of federally controlled substances into the United States, and/or arranging for travel to or meetings in Mexico;

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

### III. Government procedures for warrant execution

The United States government will conduct a search of the information produced by Facebook and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from Facebook that does not fall within the scope of Section II and will not further review the information absent an order of the Court.